UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

OLIVIA BALL, et al.,

          **Plaintiffs,**                   **Case No. 2:20-cv-2681**
                                     **JUDGE EDMUND A. SARGUS, JR.**
         **v.**                     **Magistrate Judge Elizabeth Preston Deavers**

OLENTANGY LOCAL SCHOOL
DISTRICT BOARD OF EDUCATION, et al.,

          **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants Rebecca Granata, Valerie Lawrensen, William Warfield, and Olentangy Local School District Board of Education's (collectively, "Defendants") Motion for Summary Judgment as to Claims of Plaintiff Jade Davis (ECF No. 38) and Motions for Summary Judgment as to Claims of Plaintiff Olivia Ball (ECF Nos. 39, 49). Plaintiffs filed a Response in Opposition to both motions (ECF No. 50) and Defendants replied (ECF No. 60). For the following reasons, the Court **GRANTS** Defendants' motions.

## I.     INTRODUCTION

The allegations in this case claim deeply offensive conduct by parties not involved in this lawsuit. To be clear, the school board, principal, and assistant principal were not the alleged perpetrators of the offensive conduct. The lawsuit claims that the Defendants failed to respond in an appropriate way in response to the offensive conduct. As described below, the Plaintiffs must prove that the Defendants were deliberately indifferent to the offensive conduct. The Plaintiffs have failed to demonstrate a genuine issue of material fact.

## II.    BACKGROUND

This case arises out events at Olentangy Liberty High School ("Liberty") in Columbus, Ohio from 2014 to 2020. Plaintiffs Jade Davis and Olivia Ball (collectively, "Plaintiffs"), two former Liberty students who are Black, aver that the high school staff, principal, and Olentangy Local School District Board of Education ("Board") failed to respond appropriately to racist and discriminatory acts at the school.

Plaintiff Olivia Ball is a 2018 graduate of Liberty. (Ball Dep. at 21, ECF No. 41-1.) Plaintiff Jade Davis is a 2020 graduate of Liberty. (Davis Dep. at 10, ECF No. 41-2.)  Defendant William Warfield is the Principal of the school, Valerie Lawrensen is the Assistant Principal, and Defendant Rebecca Granata is the Yearbook class teacher. (Warfield Dep. at 7, ECF No. 41-3; Granata Dep. at 9, 22, ECF No. 41-5.) Both Plaintiffs allege that racially derogatory events occurred at Liberty and were not addressed properly by the Board. Plaintiff Ball also alleges that she was discriminated against based on her disability.

### A.  Student's Comments to Olivia Ball in Math Class

During Olivia's freshman year at Liberty, in 2014, she alleges that an older white student in her math class asked her questions such as, "are you from the ghetto?" and "do you eat watermelon?" (O. Ball Aff. ¶ 3, ECF No. 50-4.) Olivia told him to stop but he persisted for seven months, and she struggled to concentrate. (*Id.* ¶¶ 3–4.) Olivia's mother, Libby Ball, reported the conduct to Principal Warfield for the first time on March 12, 2015. (L. Ball Aff. ¶ 3, Ex. 1, ECF No. 50-3.) In response, Principal Warfield interviewed Olivia and then spoke to the student and his parents. Principal Warfield testifies that he "spoke with [the student] about just what this meant and what these words meant and how hurtful they were and how this was not acceptable and how this would not be tolerated from him." He states that he "spoke to him pretty harshly about how [he] felt about the scenario and how unacceptable this was to talk to a minority student this way,

2

or any student this way." The school suspended the student for several days. (Warfield Dep. at 36–38.)

Mrs. Ball avers that Principal Warfield did not inform them about the investigation besides saying he would take care of it. (L. Ball Aff. ¶ 4.) Principal Warfield avers that he legally could not discuss the specifics of the student's discipline with the Ball family due to student privacy rights but told the family that he would take care of it and it would not happen again. (Warfield Dep. at 38.) According to Olivia, the student was gone for several days and never spoke to her again. (Ball Dep. at 46.)

### B. Cross-Country Team's "Thug Thursday" Theme

During her sophomore year, in September 2016, Olivia's cross-country team captains chose the theme "Thug Thursday." Other members of the team arrived at practice wearing jerseys of professional Black athletes, sagging bottoms, backward baseball caps, and talking in slang as if they were "from the ghetto." (O. Ball Dep. at 50; L. Ball Dep. at 39, ECF No. 50-6; Warfield Dep. at 40.) Olivia was one of a few students of color on the team and she felt uncomfortable with the theme and the manner in which her white teammates chose to portray "thugs." (O. Ball Aff. ¶ 5.) Olivia told her coach that the portrayal was offensive. Later, the coach posted a photograph of the team on social media. (O. Ball Dep. at 52.)

Mrs. Ball and Olivia reported the incident to the athletic director, Principal Warfield, and emailed the coach to explain that "thug" was a euphemism for troubled Black youth. (L. Ball Aff. ¶ 6, Ex.2.) Half-an-hour after Mrs. Ball's email to the coach, he responded via email, stating:

> I apologize but I just received this message today after school. If I'd known there was a concern I would have said something to the girls yesterday. I wish Olivia would have said something to me. You should know this was not suggested or sanctioned by the coaches. But by the same token we did not stop it either which I will take responsibility for. In the future I will try to be more considerate regarding this issue.

(Warfield Dep, Ex. 1.) The photo of the team was removed from social media. (O. Ball. Aff. ¶ 7.)

The next day, Principal Warfield pulled Olivia out of class to ask her about the incident. (O. Ball Dep. at 54.) Olivia avers that he wrote down everything she told him and said that he would take care of it. (*Id.*)

Mrs. Ball received a call in response to her complaint from the athletic director and spoke on the phone with a school board member. (L. Ball Aff. ¶¶ 6, 7.) Olivia and her mother allege that no one admitted the theme was inappropriate and that they did not know how the district addressed it. (L. Ball Aff. ¶ 7; O. Ball Aff. ¶ 6.)

Principal Warfield, along with the athletic director, allegedly investigated the matter and concluded that the theme was inappropriate and racially insensitive. (Warfield Dep. at 40–43.) The school implemented a new policy that the team had to receive administrator approval for future themes. (*Id.*) Olivia confirmed that there were no more issues concerning race on the cross-country team. (O. Ball Dep. at 56.)

### C. Comments in a Jade Davis's Group Text

On December 5, 2016, a group text thread that Plaintiff Jade Davis was a part of included racially derogatory texts. (Davis Dep. 22, ECF No. 50-2.) Jade allegedly asked the students to identify themselves, and a student responded to Jade, stating, "the gorillas are on the loose," and "CALL THE ZOO KEEPERS." (Warfield Dep., Ex. 2.) Jade promptly reported the incident to Principal Warfield and he asked her to email him screenshots of the group chat. (Davis Dep. at 27.) According to Jade, when she told Principal Warfield that she didn't know the messenger's identities in the group text, he responded that "since he didn't know who they were either, there was not much he could do." (*Id.* at 28.) According to Principal Warfield, he found out who was in the group text, interviewed the students, called their parents and told them the contents of the text messages, and ultimately suspended the responsible students. (Warfield Dep. at 48, 50.) Jade avers

that he did not follow up with her further. (Davis Dep. 28.) Principal Warfield alleges that he spoke to her about it again and that he talked to her almost every day. (Warfield Dep. at 51.)

### D. Bathroom Stall Message

At the start of the 2017-2018 school year, "Death to all nigger and nigger lovers" was written in a bathroom stall at Liberty. (Warfield Dep. at 56.) Jade, Olivia, and other students found the graffiti alarming and were afraid to attend school. (*Id.* at 58; VanZwieten Aff. ¶¶ 3–4, ECF No. 50-1; O. Ball Aff. ¶ 9; Davis Aff. ¶ 8.)

Principal Warfield testified that he immediately had the custodial staff remove the message. (Warfield Dep. at 56–57.) He also made an announcement on the PA system that the behavior would not be tolerated and is completely unacceptable. According to Warfield, he never used the PA system, and for him to do so "it had to be a pretty serious scenario." Thereafter, Warfield had three other staff members help him investigate, including the assistant principal. They looked at security cameras to try to discover who went into the bathroom at the time but did not identify the responsible party because there were students coming in and out of the bathroom. (*Id.* at 57.) The writing was posted on Snapchat by students and the school attempted, but were unsuccessful, at finding out who was posting it. (*Id.* at 60.) At the time, the school provided professional development to teachers and worked with diversity clubs to address race issues. (*Id.* at 59.)

Jade and Olivia do not recall Principal Warfield making any public announcement and aver that the school district did nothing further to alleviate student concerns about the graffiti. (Davis Aff. ¶ 8; O. Ball Aff. ¶ 9.)

5

### E. Student Use of the "N-Word"

In Olivia's junior year of school, a Liberty student allegedly pulled up next to her at a stoplight and yelled "nigger" at her. (O. Ball Aff. ¶ 8.) She reported the student's name and conduct to her guidance counselor that same day but heard nothing further. (*Id.*)

During Jade's freshman year, in 2016, she claims a student ran through the hallway and yelled "Nigger!" (Davis Dep. at 31–34.) No one else in the class said they heard it, including the two teachers who were present. (*Id.*) Jade avers that the math teacher stood up and closed the door and, when Jade asked to use the restroom, the teacher asked Jade not to say anything. Jade assumed the teacher was telling her not to confront the student who yelled. (*Id.* at 34.) Jade reported the racial slur, and the teacher's reaction, to Principal Warfield. (*Id.* at 37.) He allegedly offered to have a conversation with Jade and the classroom teachers, but Jade reports that no conversation took place. (*Id.*) Principal Warfield investigated the matter by interviewing the two classroom teachers. The teachers told him that they did not hear any racial slurs and if they had, they would have chased the student down the hall to catch him or her. Principal Warfield reviewed camera footage to see if he could identify any students running by the classroom, but the rotating cameras did not point in the right direction at the time of the incident. (Warfield Dep. at 53–54.)

In January 2018, a video of a Liberty student yelling the word "nigger" circulated on social media. (Davis Aff. ¶ 9, Ex. 1.) Jade allegedly recognized someone in the video and tagged Board members on Twitter to alert them to the student's conduct. Jade alleges that Principal Warfield called her to his office the next day and explained there was little he could do because the video was not made on school property and school was not in session. (Davis Dep. at 50.) Principal Warfiled, however, testifies that he "emergency removed" the student from the school when the video surfaced and told her to stay home until the school figured out what to do. Then, he met with the student and her mother to discuss the incident. The student was required to meeting with the

diversity, equity, inclusion supervisor for multiple sessions to talk about how what she did was inappropriate and unacceptable. (Warfield Dep. at 84–85.)

Around the same time, a Liberty student shared a photo on Snapchat of the word "nigger" drawn across his stomach. (Raiff Dep. Ex. F, ECF No. 50-7.) Jade saw the post and exchanged messages with the student about the offensive and racist nature of the photo. (Davis Aff. ¶¶ 11–12.) Mikela Thomas, Jade's sister, sent an email to Principal Warfield attaching screenshots of the post and the exchange between Jade and the student. (Raiff Dep. at 55.) Superintendent Raiff was also notified of Ms. Thomas' report, and allegedly discussed the matter with her. (*Id.*) Jade alleges that she did not hear from any District member regarding her sister's report of racist conduct. (Davis Aff. ¶ 11.)

### F. School Board Meeting

On March 1, 2018, several Black Liberty students attended a school board meeting. Jade told the Board that students had called her "nigger," "tar," and "ape" and that she was afraid to go to school. (Davis Aff. ¶ 5.) The students complained that the student handbook stated that students "may" be disciplined for use of racial slurs, rather than "would be" disciplined. (Raiff Dep. at 66.) The Board agreed with the students and changed the policy to reflect the students' requests. (*Id.*)

Prior to the March 1, 2018 board meeting, Superintendent Raiff reached out to one of the participating Black students and suggested "a more productive use of everybody's time" would be to meet with him instead because he had the resources address their concerns. (*Id.*) Olivia avers that the students believed Superintendent Raiff was trying to discourage them from attending the meeting. (O. Ball Aff. ¶ 10.)

### G. Senior Prank

As Olivia was about to graduate in 2018, seniors in her class discussed ideas for a senior class prank on a group chat. (O. Ball Dep. at 138–141.) One of her classmates suggested listing

their Black principal, Mr. Warfield, for sale as a slave on Craigslist. (*Id.*) Olivia sent screenshots of the group chat to a school board member, a teacher, and reported it to Principal Warfield. (*Id.* at 140–41.) Olivia did not learn of anyone addressing her complaint. (O. Ball Aff. ¶¶ 12–13.) Principal Warfield testified that he called the student's parents, suspended him, and reported it to a compliance officer. (Warfield Dep. at 92.)

### H. Alleged Disability Discrimination in Yearbook Class

Plaintiff Olivia Ball alleges that she was discriminated against in a yearbook class during her junior year at Liberty. The same year, Olivia was diagnosed with major depressive disorder. (O. Ball Aff. ¶ 14.) She was hospitalized twice because of mental health issues. (*Id.* ¶ 15.) While she was absent from school, Olivia allegedly heard from another student that Mrs. Granata, her Yearbook class teacher, told the class Olivia "was in the hospital and she hoped Olivia was getting better." (O. Ball Dep. 96–98.) She also alleges that Plaintiff Jade Davis informed her that Mrs. Granata told the class that Olivia was in the hospital for attempting suicide. (*Id.* at 98–99.)

Olivia avers that she had issues with Mrs. Granata earlier in the school year. Mrs. Granata allegedly humiliated her by sharing a private conversation between Olivia and another student with the class, stating that Olivia was "an embarrassment to [the other student] because [she] acted weird in the lunchroom." (ECF No. 50-4, Ex. 1.)

Additionally, Olivia alleges that Mrs. Granata showed favoritism to one student, the editor of the yearbook, and ignored the ideas offered by others, including herself. (Ball Dep. at 112.) She further testifies that she had a falling out with the editor because they disagreed on how to select superlatives for each grade that year. Eventually, the editor told Olivia via text that she did not want to speak to her. (*Id.* at 114–115.) A couple days later, Olivia stepped into the hallway with Mrs. Granata and showed her the text. Olivia avers that Mrs. Granata told her to "apologize to the editor and that she had been a burden on the class" for not being "part of the class and

contributing." (*Id.* at 120.) Olivia refused to apologize and was confused because her hospitalization "wasn't even something that had been mentioned in why [the editor] refused to talk to her." (*Id.* at 115–16.)

Seven days later, Plaintiff confronted the editor and asked if they were ever going to speak to each other again. (*Id.* at 117–18.) Plaintiff started crying and raising her voice. She put her head down and said, "this class is the reason I want to kill myself." She also told Mrs. Granata that "she was the problem." (*Id.*)

The incident was reported to administration and, the next day, Mrs. Granata met with Plaintiff's mother and Assistant Principal Valerie Lawrensen at the school to discuss what occurred. (Granata Dep. at 22.) Principal Warfield contacted the editor's parents who refused to meet. Plaintiff did not return to class again after that date. The school put in place an accommodation so that if she returned, an administrator would be in the room. (Ball Dep. at 123–24.) Olivia claims that she had to withdraw from the class. (O. Ball Aff. ¶ 20.)

On March 1, 2018, Mrs. Ball contacted the school to report that Olivia was being harassed based on her disability by yearbook staff members and Mrs. Granata. (L. Ball Aff. ¶¶ 8, 9.) She also wrote to the Superintendent on March 22, 2018 about Liberty's alleged lack of effort to address the harassment or investigate the conduct of Mrs. Granata. (L. Ball Aff. ¶10, Ex. 4, Ball Ltr. to Raiff, March 22, 2018.) She avers that Principal Warfield informed her there would be no investigation. (*Id.*) Olivia, however, testified that she knew the principal was conducting an investigation and that he spoke to all the students in the class, including her. (Ball Dep. at 125.)

Principal Warfield met with Mrs. Granata on April 10, 2018 to discuss the yearbook class. (Warfield Dep. at 76.) The District's Director of Human Resources and an Anti-Harassment Compliance Officer also interviewed students as a part of the investigation. (Patrick Dep. at 33–34.) Mrs. Ball and her husband were invited to speak with the District's Anti-Harassment

Compliance Officer and the Principal on April 18, 2018. (L. Ball Aff. ¶ 11.) During the meeting, Principal Warfield informed them of the ongoing investigation and allegedly acknowledged that the classroom environment was toxic and lacked leadership. (*Id.* ¶ 12.) Ultimately, Mrs. Granata was disciplined for discussing Olivia's hospitalizations with the yearbook class. (Warfield Dep. at 76.)

Plaintiffs filed this lawsuit in federal court on May 26, 2020, asserting race discrimination, disability discrimination, and recklessness. Plaintiff seeks declaratory judgment and compensatory damages. (*See* Am. Compl.) Defendants filed the instant two motions for summary judgment, one for Plaintiff Jade Davis's claims and one for Plaintiff Olivia Ball's claims. The motions are ripe for review.

### III.    STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("The requirement that a dispute be 'genuine' means that there must be more than some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

## IV. ANALYSIS

Defendant moves for summary judgment on all Plaintiffs' claims: (1) race discrimination under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d) against the Board; (2) Fourteenth Amendment Claims under 42 U.S.C. § 1983 against all Defendants; (3) Plaintiff Olivia Ball's claims under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act against all Defendants; (4) Plaintiff Olivia Ball's recklessness claim against Defendant Granata. (*See* Am. Compl.)

### A. Title VI Claim Against the Board

Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Defendant Olentangy Local School District Board of Education qualifies as a "program or activity receiving Federal financial assistance" under the statute. *See* 42 U.S.C. § 2000d-4a(2)(B).

A plaintiff asserting a Title VI student-on-student harassment claim against a school must show: "(1) the harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school; (2) the defendant had actual knowledge of the harassment; and (3) the defendant was deliberately

indifferent to the harassment." *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 258–59 (6th Cir.2000) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999)).

Defendants argue that the third element is determinative in this case. (ECF No. 49 at 13.) The Court agrees. There is no genuine issue of material fact as to whether the Board was deliberately indifferent to the racial harassment experienced by Plaintiffs at Liberty. Most of the deplorable conduct at issue here involved other students. Some involved a teacher who was disciplined. Several of the offending students were suspended. It is undisputed that Defendants took multiple actions after each complaint and that the perpetrators did not repeat the challenged conduct.

Deliberate indifference occurs where the defendants' "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Vance*, 231 F.3d at 260 (quoting *Davis*, 526 U.S. at 642). It arises when "school officials are aware of the misconduct but do nothing to stop it, despite [the school district's] ability to exercise control over the situation." *Horner v. Ky. High Sch. Athletic Assn.*, 206 F.3d 685, 692 (6th Cir. 2000). This demonstrates "an official decision. . . .not to remedy the violation." *Davis*, 526 U.S. at 642. Therefore, "[a] plaintiff falls short of showing deliberate indifference where the school's disciplinary and remedial responses were reasonably tailored to the findings of each investigation." *Gordon v. Traverse City Area Pub. Sch.*, 686 F. App'x 315, 324 (6th Cir. 2017).

Overall, Plaintiffs do not dispute that the Board responded as it alleges. Instead, they argue that the Board took steps other than those outlined in the Board's Anti-Harassment Policy. (ECF No. 50 at 13.) The Anti-Harassment Policy states, in pertinent part:

> Any Board employee who directly observes unlawful harassment is obligated…to report such observations to the compliance Officer(s) within two (2) days. Additionally, any Board employee who observes an act of unlawful harassment is expected to intervene to stop the harassment…Thereafter, the Compliance Officer(s) or designee must contact the Complainant…or Complainant's

12

> parents/guardians…within two (2) days to advise of the Board's intent to
> investigate the alleged wrongdoing.

(ECF No. 50-5 at 4.) Principal Warfield testified that he did not recall whether several incidents of

harassment were reported to a compliance officer, including: Olivia's harassment by a student in

her math class, the "Thug Thursday" theme, the group text messages saying there was "a gorilla

on the loose," and the student running by Jade's class and yelling "nigger." (Warfield Dep. at 38,

45, 50, 55.) Principal Warfield does remember reporting the student who said "nigger" in a social

media video and the senior prank text message incident to a compliance officer. (*Id.* at 86, 92.)

Plaintiffs' argument that the Board was deliberately indifferent because it did not follow

its own policies to address harassment every time harassment occurred is without merit because a

failure to follow internal policies, without more, does not constitute deliberate indifference. *See

Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998); *Winkler v. Madison Cnty.*, 893

F.3d 877, 891 (6th Cir. 2018) ("Nor does the failure to follow internal policies, without more,

constitute deliberate indifference."); *Andujar v. Rodriguez*, 486 F.3d 1199, 1204 n.5 (11th Cir.

2007) ("Failure to follow procedures does not, by itself, rise to the level of deliberate indifference

because doing so is at most a form of negligence."). Instead, the appropriate focus is on whether

Defendants violated Plaintiffs' federal constitutional or statutory rights by failing to act in an

appropriate manner, whatever that manner may be. *Winkler*, 893 F.3d at 892 (citing *Meier v. Cnty.

of Presque Isle*, 376 F. App'x 524 529 (6th Cir. 2010)).

Furthermore, Plaintiffs' contention in their Response that "there was little to no effort to

address the racially hostile environment within the school" is unsupported by the record. The

undisputed facts are as follows: when Olivia was subject to racial harassment by a student in her

math class, Principal Warfield acted as soon as he was notified, spoke to the student and his

parents, and suspended the student for several days; when Olivia and Mrs. Ball reported the cross-

country's "Thug Thursday" theme, Principal Warfield, the athletic director, and the coach took

down the photo, spoke with Olivia and her mom, and implemented a policy that the team must seek approval for future themes; when a student wrote racist things in a bathroom stall, Principal Warfield had it removed and worked with the Board's diversity and inclusion officer to speak to diversity clubs; when Olivia reported that seniors joked about posting Principal Warfield's photo on Craigslist to advertise him as a slave, the school talked to the student and his parents, suspended the student from school for two days, and reported to the incident to the Board's Anti-Harassment Compliance Officer.

Similarly, as to Plaintiff Jade Davis: when Jade reported that a student ran by her classroom screaming the "N-word," Principal Warfield interviewed her and two teachers in the room and reviewed camera footage to try to catch the student; when Jade reported a group text where students said "gorilla on the loose" and "call the zookeeper," Principal Warfield interviewed students in the chat, called their parents, and suspended the responsible student once he discovered their identities; when Jade and her sister reported students using the "N-word" on social media, Principal Warfield required the student to meet with the District's diversity, equity, and inclusion supervisor for multiple sessions to discuss her behavior and its impact, then reported the incident to a compliance officer.

When viewing the totality of these responses to racial harassment, there is no genuine issue of material fact as to whether the Board's actions were "clearly unreasonable" in light of the information before it. *Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612, 619 (6th Cir. 2012); *Davis*, 526 U.S. at 649. The Board made changes to its policies when Liberty students attended the Board meeting and asked for change. The Board and Principal Warfield promptly addressed each incident brought to their attention and their responses "were reasonably tailored to the findings of each investigation." *Gordon*, 686 F. App'x at 324. Even though Defendants' responses may not have been the most reasonable or ideal response in Plaintiffs' view, or the response set

14

out by the Board's policies, the Supreme Court has explicitly stated that the standard is not a "reasonableness" standard. *Davis*, 526 U.S. at 649. The Board had to "respond in a manner that [was] not clearly unreasonable." *Id.* Plaintiffs concede that after each Board response, there were no further acts of racial harassment from that specific student or in that context. Thus, the Board "did not have reason to believe that its 'efforts to remediate [were] ineffective' or disproportionate because there were no repeat offenses or offenders." *See Vance*, 231 F.3d at 261.

Although the Board and principal did not fully explain their investigations and discipline measures with Plaintiffs, the school is not required, and is actually prohibited from, sharing such information with other students and their families under the federal Family Educational Rights and Privacy Act (FERPA) and the Ohio Student Privacy Act.[1] Failing to inform the harassed students of the outcome of each investigation does not make the investigation "clearly unreasonable." Moreover, school administrators are not required to "engage in particular disciplinary action" and courts should not "second-guess the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648. A school does not have to "immediately suspend or expel a student accused of…harassment" to avoid deliberate indifference. *Id.*

For the incidents of harassment occurring outside of school—a student yelling the "N-word" at Olivia at a stoplight, a student yelling the "N-word" in a Snapchat video on New Year's Eve, a Snapchat photo of a student with the "N-word" written on his stomach, etc.— the Board is not liable for its responses. Liability for peer harassment is limited to circumstances where the recipient of federal funds exercises "substantial control over both the harasser and the context in

---

[1] Congress provides funds to educational institutions under the Family Educational Rights and Privacy Act (FERPA) on the condition that such institutions do not have a "policy or practice of permitting the release of education records (or personally identifiable information contained therein . . .) of students without the written consent of [the students or] their parents[.]" 20 U.S.C. § 1232g(b)(1). Disciplinary records are "education records" under FERPA and are therefore restricted. *United States v. Miami Univ.*, 294 F.3d 797, 813–15 (6th Cir. 2002).

Ohio's equivalent statute, the Ohio Student Privacy Act, similarly states that "[n]o person shall release, or permit access to, personally identifiable information other than directory information concerning any student attending a public school" unless under one of the enumerated exceptions. R.C. 3319.321.

which the known harassment occurs." *Davis*, 526 U.S. at 645. When an incident occurs off campus and outside school hours, the school does not exhibit substantial control over the harasser and the context. Those actions cannot be used as evidence of deliberate indifference. *See Gordon*, 686 F. App'x at 324 (finding that off-campus internet use could not serve as evidence of deliberate indifference because the school did not exercise substantial control over the students when the harassment occurred).

Because there is no genuine issue of material fact as to whether the Board was deliberately indifferent to the racial harassment experienced by Plaintiffs, Defendants are entitled to summary judgment on Plaintiffs' Title VI claims.

### B. Fourteenth Amendment Substantive Due Process Claim Against All Defendants

The Fourteenth Amendment provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Under the doctrine of substantive due process, "the Fourteenth Amendment's Due Process Clause protects unenumerated liberties." *Tennessee v. Lane,* 541 U.S. 509, 562 (2004). A claim under this theory may be brought under § 1983 if he or she is deprived "of any rights, privileges, or immunities secured by the Constitution and laws," as a result "of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. Plaintiffs assert Fourteenth Amendment violations pursuant to 42 U.S.C. § 1983 on the basis that Defendants violated their constitutional right to be free from race discrimination.

As for Plaintiffs' § 1983 claim against the Board, liability cannot be imposed under a *respondeat superior* theory; rather, Plaintiffs must show that the Board itself is the wrongdoer. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Specifically, Plaintiffs must show:

(1) The existence of a clear and persistent pattern of abuse;

(2) Notice or constructive notice on the part of the Board;

(3) The Board's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and

(4) The Board's custom was the "moving force" or direct causal link in the constitutional deprivation.

*Doe v. Claiborne County, Tenn.,* 103 F.3d 495, 507 (6th Cir. 1996). Plaintiffs fail to present sufficient evidence of the third element, deliberate indifference. The Sixth Circuit has held that the absence of deliberate indifference pursuant to a Title VI claim, as discussed in the previous section, is likewise fatal to a companion municipal liability claim made under § 1983. *See Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 492 (6th Cir. 2006). That is because Title VI, Title IX, and § 1983 deliberate indifference standards are substantially the same.[2] Since there is insufficient evidence to create a genuine issue of material fact as to whether the Board was deliberately indifferent to racial harassment under Title VI, the § 1983 claim does not survive for the same reasons.

Although the Complaint asserts § 1983 claims against "all Defendants" (Am. Compl., ECF No. 10), the Response in Opposition to Defendants' Motion for Summary Judgement argues only for a § 1983 claim against the School Board. Plaintiff makes no arguments that the individual defendants are liable under § 1983. (ECF No. 50 at 17.) Accordingly, even viewing the facts in the light most favorable to Plaintiffs, the Court finds all Defendants are entitled to summary judgment on Plaintiffs' Fourteenth Amendment § 1983 claims.

---

[2] *See Williams ex rel. Hart v. Paint Valley Local Sch. Dist.,* 400 F.3d 360, 369 (6th Cir. 2000) (stating that the deliberate indifference standard is substantially the same under Title IX and § 1983); *Williams*, 455 F. App'x at 618 n.6 (stating that the deliberate indifference standard is substantially the same under Title VI and § 1983).

C. **Plaintiff Olivia Ball's Rehabilitation Act and ADA Claims Against All Defendants**

Plaintiff Ball asserts that Defendants violated Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973 by failing to ensure that she was safe from harassment based on her disability and received an equal access to education in Yearbook class. (ECF No. 50 at 20.)

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. 794(a). In sum, both Acts allow disabled individuals to sue school districts that discriminate against them because of their disability or fail to protect them from discrimination. *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 681 (6th Cir. 2016). Given the similarities in the two statutes, courts merge the analyses under the ADA and Rehabilitation Act." *Qiu v. Univ. of Cincinnati*, 803 F. App'x 831, 836 (6th Cir. 2020).

First, as Defendants correctly argue, to the extent that Plaintiff Ball's claims were brought against the individual defendants in their personal capacities, they are entitled to summary judgment because there is no individual liability under the ADA. *See Carten v. Kent State Univ.*, 282 F.3d 391, 396–97 (6th Cir. 2002).

As for the claims against the Board and individual defendants in their official capacities, Plaintiff Ball cites to the standard for peer-on-peer disability harassment in her Response, but her arguments are directed toward disability harassment by Defendant Granata, her Yearbook class

teacher.[3] (ECF No. 50 at 18.) The proper standard for disability discrimination that is not peer-on-peer harassment is outlined in *Gohl*.

Plaintiff Ball can defeat summary judgment through either a direct or indirect showing of discrimination based on her disability. *Gohl, 836 F.3d* at 682. Direct evidence is that which does not require the factfinder to make any inferences before concluding that unlawful discrimination happened. *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916 (6th Cir. 2013). Plaintiff Ball does not present direct evidence of discrimination. She alleges that she was treated differently by Mrs. Granata, the yearbook editor, and her classmates but does not present sufficient evidence that she was treated differently *because* she was hospitalized.

Plaintiff may instead proceed under the familiar *McDonnell Douglas* test. *Gohl*, *836 F.3d* at 682. To establish a *prima facie* case of discrimination under Title II, a plaintiff must allege facts showing that she "(1) is disabled under the statutes, (2) is 'otherwise qualified' for participation in [a government] program, and (3) 'is being excluded from participation in, denied the benefits of, or subjected to discrimination' [under the program] because of [her] disability or handicap." *Id.* Defendants only dispute the third element, causation.

Under the ADA, Plaintiff must present evidence of a but-for relationship between the protested act and her disability. *See M.J. by and through S.J. v. Akron City School Dist. Bd. Of Educ.*, 1 F.4th 436 (6th Cir. 2021). She is required to present "sufficiently 'significant' evidence of animus toward her that is a but-for cause of the discriminatory behavior." *Id.* (*quoting Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015)). Under the Rehabilitation Act, the showing

---

[3] Plaintiff cites to *S.S. v. Eastern Kentucky Univ.*, 532 F. 3d 445, 454 (6th Cir. 2008), which outlines the proper test for peer-on-peer harassment, not harassment by a teacher. Even under the *S.S.* standard, Plaintiff does not survive summary judgment because there is no genuine issue of material fact as to whether the Board was "deliberately indifferent" to her alleged disability discrimination, as the standard requires. The school interviewed all the students in the class, placed an adult observer in the class, disciplined the teacher, and offered Plaintiff Ball mental health counseling. The school also notified a compliance officer and invited Olivia's parents to participate in the process. Even if there was a slight delay in their actions, as Plaintiff alleges, the overall response was not "clearly unreasonable" so as to make the school deliberately indifferent to any harassment.

of causation is harder. Plaintiffs must show that the school and its employees discriminated against them "solely" because of their disability. 29 U.S.C. § 794(a). Finally, to show causation under each Act, "plaintiffs must present evidence of how the school treated comparable, non-disabled students." *M.J.*, 1 F.4th 436 at 452.

Here, Plaintiff Ball fails to point to any comparators. She notes that Mrs. Granata humiliated her in front of the class by sharing a private conversation between her and another student, that Mrs. Granata told her she could bring in baked goods for credit, and that she was given busy work in Yearbook class, etc. but she says nothing about whether the other students in the class were also disabled. (ECF No. 50 at 18.) The Sixth Circuit has held that, without comparators, a plaintiff under Title II cannot make an indirect showing of discrimination. *See M.J.*, 1 F.4th 436 at 452 (granting summary judgment on ADA and Rehabilitation Act claims because the plaintiff did not present evidence of whether the other students were disabled); *Gohl*, 836 F.3d at 683 ("[i]n the absence of evidence of a well-treated comparator, [plaintiffs] cannot prove that discrimination against the disabled was the reason for" their mistreatment). Additionally, Ball claims that she and Granata had been on bad terms before her disability arose, rebutting any inferences of causation. Consequently, Defendants are entitled to summary judgment on Plaintiff Ball's ADA and Rehabilitation claims.

### D.  Plaintiff Ball's Recklessness Claim Against Defendant Granata

Plaintiff Ball also asserts a "Recklessness Claim" against Defendant Granata and states that Granata was responsible for her classmates' awareness of her disability and blamed Olivia's disability for burdening the yearbook staff. (ECF No. 50 at 20.) In her Amended Complaint, Plaintiff asserts a cause of action labeled "Recklessness/Wantonness." (Am. Compl. ¶¶ 83–86.) Within, Plaintiff alleges that Defendant Granata breached her duty to "act in a reasonably prudent

manner when executing her duties as a teacher; to supervise and monitor students; and to protect students from harassment, bullying, and disability-based discrimination." (*Id.* ¶ 84.)

Ohio law does not recognize a stand-alone cause of action for recklessness. *See, e.g.*, *Brown v. Whirlpool*, 996 F. Supp. 2d 623, 643 (N.D. Ohio Feb. 10, 2014); *Cincinnati Ins. Co. v. Oancea*, 2004 Ohio 4272, 2004 WL 1810347, *3 (Ohio App.) ("Willful, wanton, and reckless conduct is technically not a separate cause of action, but a level of intent which negates certain defenses which might be available in an ordinary negligence action."). Because there is no cause of action for recklessness or wantonness under Ohio law, Defendants are entitled to summary judgment on Plaintiff's fourth cause of action.

## V.    CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' Motions for Summary Judgment (ECF Nos. 38, 39, 49). The Clerk is directed to close this case.

**IT IS SO ORDERED.**


**2/28/2022**                              **s/Edmund A. Sargus, Jr.**
**DATE**                                    **EDMUND A. SARGUS, JR.**
                                            **UNITED STATES DISTRICT JUDGE**